IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| BLACK DAVIS and SHUE AGENCY, INC., | * | |
| Debtor | * | Case No.: 1-06-bk-00051MDF |
| | * | |
| BLACK DAVIS and SHUE AGENCY, INC., | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Adv. No.: 1-06-ap-00098 |
| | * | |
| EASTERN ALLIANCE INSURANCE | * | |
| GROUP, t/a EASTERN ALLIANCE | * | |
| INSURANCE COMPANY, ALLIED | * | |
| EASTERN INDEMITY COMPANY | * | |
| and EMPLOYERS ALLIANCE, INC. | * | |
| Defendants | * | |

**OPINION**

Before me is the Motion of Black Davis & Shue ("BDS") seeking an award of damages against Eastern Alliance Insurance Group ("Eastern Alliance") for violation of the automatic stay, pursuant to 11 U.S.C. § 362(k), and for contempt of court, pursuant to 11 U.S.C. § 105(a).

**Factual and Procedural History**

BDS filed a petition under chapter 11 of the Bankruptcy Code on January 26, 2006. At the time the petition was filed, BDS was a party to an Alternative Market Agency Agreement ("Agency Agreement") with Eastern Alliance. The Agency Agreement authorized BDS to "solicit, submit and service policies of insurance" for an alternative market insurance program known as Pennsylvania Alliance Company, Ltd. Rent-A-Captive Program ("PAC Program") for which Eastern served as the fronting insurance carrier. The PAC Program was created to provide workers' compensation coverage to participants in the Program.

On April 26, 2002, Eastern Re Ltd, SPC ("Eastern Re"), a company organized under the laws of the Cayman Islands, and PAC Group, LTD (the "PAC Group"), entered into an Amended and Restated Shareholder Agreement ("Shareholder Agreement") whereby Eastern Re would maintain a segregated insurance portfolio on behalf of the PAC Group. Pursuant to the Shareholder Agreement, Eastern Re entered into reinsurance agreements with Eastern Alliance for policies issued to the seventeen business members of the PAC Group, including BDS.

At a meeting in the Cayman Islands held in March 2006, Eastern Alliance verbally notified the PAC Group that because BDS had filed for bankruptcy, it was terminating the Agency Agreement. Eastern Alliance informed the PAC Group that because the Agency Agreement was being cancelled, Eastern Re was terminating the PAC Program. The PAC Program's president, Robert Zenzinger ("Zenzinger"), while acknowledging he had been informed that Eastern Re intended to dissolve the PAC, believed that the PAC Program might be preserved if a new broker was obtained to replace BDS. Zenzinger's understanding of the reason for the termination of the PAC Program was communicated by Zenzinger to the other PAC members.

On March 7, 2006, Eastern Alliance provided written notification to BDS that it was terminating the Agency Agreement effective immediately because of the bankruptcy filing. On March 27, 2006, Eastern Re notified the PAC Group that it was terminating the Shareholder Agreement effective June 29, 2006. The notice also stated that Eastern Alliance would be issuing a notice of cancellation or non-renewal of workers' compensation coverage to each PAC Group member before April 29, 2006.

2

Notice of cancellation or non-renewal was issued to the members of the PAC Group on April 11, 2006, with "agency termination" given as the reason for non-renewal of the policy. On May 9, 2006, Eastern Alliance sent a revised notice of termination to BDS stating that it was intended to "serve as a supplement to the March 7, 2005 [sic] written notice of termination of the [Agency Agreement]." The May 9 notice acknowledged that Eastern Alliance had been informed by counsel for BDS that the Agency Agreement could not be terminated "solely on the grounds that [BDS] had filed a bankruptcy petition." The notice from Eastern Alliance further stated that "[w]hile this may or may not be true, the issue is moot." As an alternative to agency termination based upon BDS's bankruptcy filing, Eastern Alliance informed BDS that it was invoking the provision in the Agency Agreement that gave either party the right to terminate the Agency Agreement upon ninety days "written notice."

Eastern Alliance did rescind the April 11 cancellation notice to the PAC Group that listed "agency termination" as the reason for non-renewal of the insurance coverage. The PAC members were advised that the PAC Program had been terminated by Eastern Re and that Eastern Alliance was offering to provide workers' compensation coverage "directly, with no involvement by any captive insurance program." The notice sent to the PAC Group further stated that Eastern Alliance was barred from terminating the Agency Agreement with BDS. Between March 2006 and the filing of the within adversary, nine members of the PAC Group designated American Insurance Administrators ("AIA") as their "exclusive Insurance Broker with respect to our entire Insurance program" "effective immediately."

On June 13, 2006, BDS filed the instant adversary case seeking a temporary and permanent injunction barring termination of the Agency Agreement and restoring the PAC

3

Program with BDS as broker. BDS also sought damages for Eastern Alliance's violation of the automatic stay and for the intentional interference with contractual relations.[1]

On June 19, 2006 the Court approved a stipulated Order which provided: (1) that the Agency Agreement would remain in effect through June 30, 2006; (2) that Eastern Alliance would provide quotes to BDS for all accounts in the PAC Group by June 19, 2006; (3) that Eastern Alliance would have no contact with the PAC Group members except to rescind the non-renewal letter (this provision was later modified to authorize contacts to service claims); (4) that BDS would be the exclusive broker through June 30, 2007 if the PAC Program were renewed or a similar program instituted; (5) that all other rights and claims were reserved; and (6) that a final agreement would be crafted by June 26, 2006 or the parties would appear for a hearing on that date. At the hearing on June 26, the parties stated they had settled the matter and that a final agreement and Order would be entered at a future date. Later, however, settlement negotiations broke down, and the matter moved to trial on June 29, 2006.

On July 11, 2007, I issued an Opinion in which I found that Eastern Alliance violated the automatic stay by terminating the Agency Agreement without obtaining approval from this Court. I further found, however, it would be inappropriate to issue a mandatory injunction

---

[1] After filing the complaint in the within adversary, BDS requested an emergency hearing on its request for injunctive relief. As part of its prayer for injunctive relief, BDS asked the Court to enjoin Eastern Alliance from interfering with contractual relationships with its customers. In its brief, BDS has sought damages for intentional interference with contractual relations although a separate count was not included in the complaint. It is clear that the complaint was filed in response to an admitted violation of the automatic stay. The court addressed the request for injunctive relief previously and will address the request for damages for violation of the automatic stay in this opinion. However, a tort claim under Pennsylvania law, a non-core matter, has not been adequately pleaded and will not be addressed by the court notwithstanding references to such a claim in briefs filed by BDS.

requiring the reconstitution of the PAC Program with BDS as the insurance broker. Since BDS was not a party to the agreement that created the PAC Program, I concluded that BDS had no standing to object to its termination. Therefore, I issued an Order dismissing the adversary complaint insofar as it sought injunctive relief, but I granted leave to BDS to file a motion for damages based on Eastern Alliance's violation of the stay when it terminated the Agency Agreement. BDS's motion for damages is now before the Court.[2]

## Discussion

In relevant part, § 362(k)[3] provides that "an *individual* injured by any willful violation of a stay provided for by this section shall recover actual damages, including costs and attorneys fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k) (emphasis added).

Damages may be awarded under § 362(k) when a creditor with knowledge that a bankruptcy petition has been filed commits a volitional act that violates the stay. *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp,* 337 F.3d 314 (3rd Cir. 2003). In the instant case, Eastern Alliance has admitted that it violated the stay when it terminated the Agency Agreement. Thus, the issue in this case is solely the amount of damages, if any, to which BDS is entitled as a result of Eastern Alliance's actions. But before considering the issue of

---

[2] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A) and (O). This Opinion constitutes the findings of fact and conclusions of law required to be made pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7052.

[3] Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 ("BAPCPA"), the provisions included in § 363(k) were found at § 362(h). Therefore, decisions rendered under pre-BAPCPA law refer to § 362(h) rather than § 362(k) when referring to remedies available to a debtor for violations of the automatic stay.

5

damages, I will address the question of whether corporations are included within the term "individual debtor" in § 362(k) and, thus, may be afforded relief under this subsection.

    a.    *Application of § 362(k) to corporate debtor.*

Appellate courts are split on the issue of whether § 362(k) is applicable to corporate debtors. *See In re Elder-Beerman Stores Corp.*, 197 B.R. 629, 631 (Bankr. S.D. Ohio 1996) (comparing *Budget Serv. Co. v. Better Homes of Va., Inc.*, 804 F.2d 289, 292 (4th Cir. 1986) (corporations may recover), *In re Atlantic Business & Community Dev. Corp*, 901 F.2d 325, 329 (3d Cir. 1990) (following *Budget Serv.* without comment) with *In re Goodman*, 991 F.2d 613, 619 (9th Cir. 1993) ("'individual' means individual, and not a corporation or other artificial entity.") and *In re Chateaugay Corp.*, 920 F.2d 183, 186 (2d Cir. 1990) (only natural persons may recover)). *See also In re Just Brakes Corporate Systems, Inc.,* 108 F.3d 881, 884 -85 (8th Cir. 1997) (rejecting *Atlantic Business* because it "did not give adequate weight to the statute's plain meaning."); *Jove Engineering, Inc. v. I.R.S.*, 92 F.3d 1539, 1550 (11th Cir. 1996) ("plain meaning of the term "individual" does not include a corporation, and applying this meaning is not demonstrably at odds with Congress's intent.")

The majority of circuits have concluded that § 362(k) applies only to natural persons and not to corporate entities. However, because the Third Circuit's decision in *Atlantic Business* has not been overruled, I am bound to follow its holding.[4]

    b. *Damages under § 362(k)*

        1.    *Lost commissions*

---

[4]BDS would not be deprived of a remedy even if I determined that § 362(k) applies only to natural persons. Courts routinely find civil contempt for violations of the automatic stay in corporate cases pursuant to § 105(a). *See Jove Engineering*, 92 F.3d at 1553.

A debtor seeking monetary damages for violation of the automatic stay must prove the amount of actual damages suffered. "The Court cannot award damages, costs or fees where none have been clearly proven. . . . Damages can only be awarded if there is evidence supporting the award of a definite amount, which may not be predicated upon pure speculation." *In re Alberto*, 119 B.R. 985, 995 (Bankr. N.D. Ill. 1990). "For § 362(h) purposes, actual damages should be awarded only if there is concrete evidence supporting the award of a definite amount" that can be ascertained with "reasonable certainty." *Doe v. United States*, 976 F.2d 1071, 1085 (7th Cir. 1992), *cert. denied*, 510 U.S. 812 (1993); *In re Heghmann*, 316 B.R. 395, 405 (1st Cir. BAP 2004) (citing *In re Sumpter*, 171 B.R. 835, 844 (Bankr. N.D. Ill. 1994)). A damages award under § 362(k) cannot be based on mere speculation, guess or conjecture. *Heghmann*, 316 B.R. at 405 (citing *Adams Apple Distrib. Co. v. Papeleras Reunidas, S. A.*, 773 F.2d 925, 930 (7th Cir. 1985)).

In the instant case, BDS adduced proof of its damages through the testimony of one of its principals, Timothy Black ("Black"). Black testified as to the amount of commissions BDS had earned in the past as the insurance broker for the PAC Program. BDS also provided the testimony of James Gordon ("Gordon"), an insurance industry actuary, who provided his expert opinion regarding the amount of future commissions that BDS could be expected to lose as a result of the termination of the PAC Program. Specifically, he projected BDS's commissions from the PAC Program during the ten-year period following its termination and concluded that the present value of commissions lost during the period was approximately $1,244,000.00. The present value of lost commissions for a fifteen-year period was projected to be $1,739,000.00. However, while neither the substance nor the accuracy of Gordon's projections was impeached on cross-examination, the projections are not relevant to the issue before me.

7

Gordon's testimony described damages flowing from the termination of the PAC Program, which was effected by Eastern Re's termination of the Shareholder Agreement. As I held in my July 11, 2007 Opinion, the stay was not violated by the termination of the PAC Program; it was violated by termination of the Agency Agreement. Therefore, in this proceeding BDS was required to quantify its damages in terms of commissions lost that otherwise would have been generated by the Agency Agreement had it not been terminated in violation of the automatic stay. The Agency Agreement authorized BDS to earn commissions by placing and servicing insurance policies associated with the PAC Program. Once the PAC was dissolved by Eastern Re in June 30, 2006 there was no group available for BDS to service.[5] Accordingly, the testimony of Black and Gordon as to future damages was based upon the assumption that the PAC Program would continue and that BDS would continue to serve as its insurance broker. Clearly, this scenario could not occur once the PAC Program was dissolved.

In prosecuting this matter, BDS asserted that Eastern Re's termination of the PAC Program was a pretext enabling Eastern Alliance to eliminate BDS so that it could direct business to a different insurance broker. To substantiate its allegations, BDS was required to prove that Eastern Re was an alter ego of Eastern Alliance and that the PAC Program was reconstituted in some other form and later serviced by another insurance agency. The evidence offered failed to substantiate BDS's argument and substantiated Eastern Alliance's assertion that the termination of the PAC was a legitimate business decision made by Eastern Re. At the time

---

[5]If the Agency Agreement had provided for BDS to serve as a broker for additional rent-a-captive insurance programs, the rights and obligations of BDS under the Agreement would not have been totally dependent on the continued existence of the PAC Program. Commissions on premiums paid would have continued to accrue despite the unlawful termination of the Agency Agreement.

the PAC Program was terminated, claims against the entity exceeded its liquid assets by over $1,000,000.00.[6] While the record indicates that Eastern Re held a letter of credit ("LOC") that secured payment of these claims, BDS failed to demonstrate that Eastern Re did not exercise sound business judgment in terminating the PAC Program instead of drawing on the LOC. Absent such evidence, I find no basis to conflate the termination of the PAC Program and the Agency Agreement.

    2.    *Attorneys' fees*

Section 362(k) specifically provides that actual damages for violation of the automatic stay includes attorneys fees. "[E]ven innocent and well-grounded violations of the automatic stay should give rise to recovery of attorneys' fees when a debtor is required to resort to a court action to vindicate rights." *In re McNeil*, 128 B.R. 603, 614 (Bankr. E.D. Pa. 1991)(citation omitted.) Other courts have found that attorneys' fees and costs may be imposed for a creditor's willful violation of the automatic stay even if the debtor has suffered no other compensable harm. *In re Heidkamp*, 334 B.R. 713 (Bankr. M.D. Fla. 2005); *In re Hedetneimi*, 297 B.R. 837 (Bankr. M.D. Fla. 2003).

Section 362(k) must be broadly construed in order to discourage creditors from violating the automatic stay. To encourage creditors to seek relief from the bankruptcy court before proceeding against a debtor, a court may impose penalties against a creditor, including the assessment of attorneys' fees, if legal action is required to vindicate a debtor's rights. *See In re Weisberg*, 218 B.R. 740, 753 (Bankr. E.D. Pa. 1998).

---

[6]According to Gordon's testimony, this debt was based on nine claims that were pending in the Spring of 2006. (N.T. 102)

9

Case 1:06-ap-00098-MDF    Doc 52    Filed 02/07/08    Entered 02/08/08 08:25:00    Desc
Main Document    Page 9 of 15

BDS offered in evidence summaries of fees incurred by Robert Knupp ("Knupp"), BDS bankruptcy counsel; Joseph Klein ("Klein"), special counsel; and Thomas Brenner ("Brenner"), special counsel. In isolation the fee summaries were inadequate to justify the imposition of sanctions for attorneys fees.[7] In the main case, however, counsel submitted and obtained approval of their fee applications for services rendered relative to the within action. I may take judicial notice of these fee applications and orders approving the fees and expenses rendered relevant to the enforcement of the automatic stay. *See Maritime Electric Co., Inc. v. United Jersey Bank*, 959 F.2d 1194 (3rd Cir. 1991); *In re Miller*, 2007 WL 4322541 (Bankr. E.D. Pa.); Fed. R. Evid. 201; Fed. R. Bankr. P. 9017. Not all of the fee applications were sufficiently detailed for me to determine whether the services were rendered in connection to the instant matter or were for services rendered in connection with the Westport litigation. When entries were not sufficiently detailed for me to determine whether the services were related to this action, they were disallowed as a measure of damages. In addition, I find that some of the services rendered by Brenner and Klein were rendered in pursuit of BDS's efforts to obtain an mandatory injunction to effect the resurrection of the PAC Program. These services, as well as the fees and expenses of James Gordon, were not included in the Court's calculation of damages. Accordingly, I find that the following attorneys fees are allowed as a measure of actual damages for violation of the automatic stay: Knupp – $11,092.50 in fees and $250.00 in expenses; Klein – $12, 250.00 in fees; and Brenner – $12,947.00 in fees and $2,038.49 in expenses. An Order requiring Eastern Alliance to pay these amounts to BDS as actual damages will be entered.

---

[7]"A party seeking attorneys' fees as a sanction must present a request from which an amount can be computed with reasonable certainty. Failure to submit same justifies a rejection of the request." *In re Central Ice Cream Co.*, 836 F.2d 1068, 1074 (7th Cir. 1987).

### *3. Punitive damages*

In addition to compensatory damages, BDS also seeks the imposition of punitive damages against Eastern Alliance. Punitive damages are appropriate when a party engages in egregious conduct. They are reserved for situations in which there is more than a simple violation that may be remedied by compensatory damages or injunctive relief. *Cochetti v. Desmond,* 572 F.2d 102, 106 (3d Cir. 1978) *cited in In re Patterson*, 263 B.R. 82, 97 (Bankr. E.D. Pa. 2001). Where the willful violation is committed in bad faith, punitive damages are appropriate. *Atlantic Business*, 901 F.2d at 329; *In re Seward,* 338 B.R. 654, 661 (Bankr. D. N.J. 2005). Punitive damages are especially appropriate when a party has acted in "arrogant defiance" of the Bankruptcy Code. *In re Medlin*, 201 B.R. 188 (Bankr. E.D. Tenn. 1996)( cited in *In re Curtis*, 322 B.R. 470, 487 (Bankr. D. Mass. 2005)). Whether actions taken by a party in connection with a violation of the automatic stay merit an assessment of punitive damages is a matter left within the sound discretion of the bankruptcy court. *Id.; Clayton v. King (In re Clayton),* 235 B.R. 801, 811 (Bankr. M.D.N.C. 1998); *In re Hendry,* 214 B.R. 473 (Bankr. E.D. Va.1997).

Four factors are considered when determining whether to award punitive damages and, if so, in what amount: (1) the respondent's conduct; (2) his motives; (3) any provocation by the debtor; and (4) the respondent's ability to pay. *In re B. Cohen & Sons Caterers, Inc.,* 108 B.R. 482, 487 (E.D. Pa.1989); *In re Patterson*, 263 B.R. at 97; *see also In re Aponte*, 82 B.R. 738, 745 (Bankr. E.D. Pa. 1988) (court must consider both the wrongdoer's act and his motive); *In re Wagner,* 74 B.R. 898, 905 (Bankr. E.D. Pa.1987)(court must consider the nature of the conduct and the ability to pay).

When these four factors, as well as considerations of bad faith, are applied to the actions of Eastern Alliance, I find that the imposition of punitive damages is warranted. Eastern

11

Alliance's failure to seek court approval before sending the notice of agency termination was clearly a willful violation of the automatic stay. Had this been the only violation committed by Eastern Alliance this Court only would have required Eastern Alliance to compensate BDS for its actual losses. But rather than take immediate steps to undo the harm, when informed that its actions violated the Bankruptcy Code, counsel for Eastern Alliance responded that it was "well within its rights" to terminate the Agency Agreement and reaffirmed the termination albeit on different grounds. A cursory view of 11 U.S.C. § 362 would have informed Eastern Alliance that it was not acting within its rights. Further, it is clear that after Eastern Alliance sent a second notice announcing that it was terminating the Agency Agreement, it worked in concert with AIA to induce participants in the PAC Group to violate the stay by terminating their broker agreements with BDS and substituting AIA. All of this activity occurred despite numerous protestations voiced by BDS's counsel that these actions violated the stay.

      I find that Eastern Alliance's conduct constitutes arrogant defiance of the Bankruptcy Code. The conduct of Eastern Alliance and its counsel supports the imposition of punitive damages. As to the remaining factors, Eastern Alliance's motivation for violating the stay was to proceed with its plan to sever the broker relationship between BDS and the PAC Group. Eastern Alliance adopted a course of action that it was determined to pursue notwithstanding the existence of a statutory order prohibiting such action. BDS did not provoke Eastern Alliance's actions, and Eastern Alliance has not alleged that it was provoked. Eastern Alliance simply wished to obtain a more favorable business arrangement, and BDS was an obstacle in its path.

      Finally, I must consider Eastern Alliance's ability to pay. Although no financial information specific to Eastern Alliance was offered into evidence, a financial statement for the insurer's holding company, Eastern Insurance Holdings, Inc., was submitted showing that the

holding company had total assets of $216.4 million in 2006 and net income of approximately $4.5 million for the period January 1, 2006 to June 16, 2006. Punitive damages should be awarded in an amount sufficient to serve their purpose of deterrence. *See In re Klein,* 226 B.R. 542 (Bankr. D.N.J. 1998); *In re Georgeff,* 226 B.R. 852 (Bankr. S.D. Ohio 1998); *In re Wills,* 226 B.R. 369 (Bankr. E.D. Va. 1998). What would be sufficient to deter one creditor may not even be sufficient to get the attention of another. Not only must punitive damages be based on the egregiousness of the violation, but they also must be tailored to the resources of the party engaged in the violation. *In re Curtis*, 322 B.R. at 487. Therefore, because Eastern Alliance is part of a corporate family with considerable assets, I believe that punitive damages in the amount of $20,000.00 will adequately serve as a deterrent to future violations of the automatic stay.

     4.  *Civil contempt damages*

 Debtor also seeks damages for contempt of Court under 11 U.S.C. § 105. Damages for civil contempt are imposed to compel compliance with a court order and to compensate a party damaged by violation of that order. *University Medical Center v. Sullivan*, 122 B.R. 919, 932 (E.D. Pa. 1990) (citations omitted). Civil contempt sanctions are remedial in nature and may be imposed even if a party acted in good faith, in the absence of willfulness, or without a specific intent to violate a court order. *Id.* Section 362(k) requires that a violation of the automatic stay be willful before damages can be awarded. Accordingly, the Code imposes a higher standard than is required to find civil contempt. *University Medical Center*, 122 B.R. at 932.

 Pursuant to 11 U.S.C. § 105(a), a bankruptcy court may use civil contempt sanctions to enforce its orders. *In re Skinner*, 917 F.2d 444, 447 (10th Cir. 1990); *In re Walters*, 868 F.2d 665, 669 (4th Cir.1989); *In re Seal*, 192 B.R. 442, 455 (Bankr. W.D. Mich. 1996); *In the Matter*

13

Case 1:06-ap-00098-MDF    Doc 52    Filed 02/07/08    Entered 02/08/08 08:25:00    Desc
Main Document    Page 13 of 15

*of Sielaff*, 164 B.R. 560, 568 (Bankr. W.D. Mich. 1994).  A court may award damages under § 362(k) or § 105 for the same violation. *Jove Engineering*, 92 F.3d at 1559 ("Regarding automatic stay violations, the Bankruptcy Code provides two relevant, independent sources for awarding attorney fees, § 105(a) (discretionary) and § 362(h) (mandatory)."); *In re Seal*, 192 B.R. 442, 455 (Bankr. W.D. Mich. 1996) ("The court will utilize both its civil contempt power and 11 U.S.C. § 362 (h) to remedy this situation."); *In re A and C Elec. Co., Inc.*, 188 B.R. 975, 981 (Bankr. N.D. Ill. 1995) ("Either a finding of civil contempt or violation under § 362(h), or both, may be appropriate should a willful and intentional violation of the automatic stay continue.").  Courts generally have held that the preponderance of the evidence standard applies to violations of the automatic stay under § 362(k), while the standard of proof in a contempt proceeding is clear and convincing. *See In re Sharon*, 200 B.R. 181, 199-200 (Bankr. S.D. Ohio 1996).

In the instant case, Eastern Alliance admitted that its post-petition termination of the Agency Agreement violated the automatic stay. Accordingly, a finding of civil contempt for this violation would be appropriate.  However, sanctions imposed for civil contempt to coerce compliance with a court order cannot be any greater than necessary to ensure such compliance and may not be so excessive as to be punitive in nature.  *Jove Engineering*, 92 F.3d at 1558.  Because I have determined that Eastern Alliance is liable to BDS for actual and punitive damages under § 362(k), I do not find that the imposition of additional sanctions for civil contempt are warranted in this case.

In conclusion, I find that BDS is entitled to actual damages in the amount of $38, 577.99 and punitive damages in the amount of $20,000.00. An order consistent with this opinion will be entered.

By the Court,

*/s/ Mary D. France*
Bankruptcy Judge

Date: February 7, 2008

*This document is electronically signed and filed on the same date.*